**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FIRST AMENDMENT COALITION OF ARIZONA, INC.; CHARLES MICHAEL HEDLUND; GRAHAM S. HENRY; DAVID GULBRANDSON; ROBERT ALLEN POYSON; TODD SMITH; ELDON M. SCHURZ; ROGER SCOTT, *Plaintiffs-Appellants*, | No. 17-16330 D.C. No. 2:14-cv-01447-NVW |
| v. | OPINION |
| CHARLES L. RYAN, Director of the Arizona Department of Corrections; UNKNOWN PARTIES, named as: John Does - unknown ADC Personnel, in their official capacities as Employees, Contractors, and/or Agents of the Arizona Department of Corrections; GREG FIZER, Warden, ASPC-Florence, *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted September 12, 2018
San Francisco, California

Filed September 17, 2019

Before:  Marsha S. Berzon, Johnnie B. Rawlinson,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Watford;
Partial Concurrence and Partial Dissent by Judge Berzon

## SUMMARY[*]

### First Amendment / Death Penalty / 42 U.S.C. § 1983

The panel affirmed in part and reversed in part the district court's dismissal of plaintiffs' second amended complaint in an action brought by Arizona death-row inmates and the First Amendment Coalition of Arizona, challenging Arizona's revised execution procedures under the First Amendment.

Plaintiffs challenged three of Arizona's practices.  First, the plaintiffs claimed that Arizona unconstitutionally restricted the ability of execution witnesses to hear the sounds of the entire execution process.  Second, the plaintiffs claimed that Arizona Department of Corrections ("ADC") officials violated their First Amendment rights by failing to disclose certain information regarding the source and quality of the lethal-injection drugs to be used in the inmates' execution.  Third, the plaintiffs claimed that ADC officials were violating the First Amendment by failing to disclose the qualifications of each execution team member who will insert intravenous lines into the inmates.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Concerning plaintiffs' claim that ADC officials violated their First Amendment right of access to governmental proceedings, the panel held that the right encompassed a right to hear the sounds of executions in their entirety. The panel further held that on the facts alleged, Arizona's restrictions on press and public access to the sounds of executions impermissibly burdened that right. The panel reversed the district court's decision as to this restriction. The panel also held that because the First Amendment right of access to governmental proceedings did not entitle the plaintiffs to information regarding execution drugs and personnel as a matter of law, the district court did not abuse its discretion by dismissing with prejudice those aspects of the plaintiffs' claim relating to such information.

Concerning plaintiffs' claim that Arizona's restrictions violated the inmates' First Amendment right of access to the courts, the panel agreed with the district court that the claim failed as a matter of law. The panel held that the district court did not abuse its discretion by dismissing this claim without leave to amend.

Judge Berzon concurred in Parts I and II of the majority opinion, but dissented as to Part III (First Amendment right of access to the courts). Judge Berzon wrote separately to call attention to the inmates' plausible allegations that Arizona, through its deliberate concealment of information about its execution process, has violated their First Amendment right of access to the courts. Judge Berzon would also hold that Arizona's approach to devising, announcing, and recording its execution procedures denied condemned inmates their right under the Fourteenth Amendment to procedural due process of law.

**COUNSEL**

Collin P. Wedel (argued), Joshua E. Anderson, Alycia A. Degen, and Katherine A. Roberts, Sidley Austin LLP, Los Angeles, California; Jon M. Sands, Federal Public Defender; Dale A. Baich and Jessica L. Felker, Assistant Federal Public Defenders; Office of the Federal Public Defender, Phoenix, Arizona; for Plaintiffs-Appellants.

Dominic E. Draye (argued), Solicitor General; Lacey Stover Gard, Chief Counsel; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Defendants-Appellees.

**OPINION**

WATFORD, Circuit Judge:

The plaintiffs in this case are seven Arizona death-row inmates and the First Amendment Coalition of Arizona, a non-profit organization that seeks to advance free speech, accountable government, and civic participation. They brought this action against officials of the Arizona Department of Corrections (ADC) to challenge aspects of the Arizona execution process. We are asked to decide whether the plaintiffs have pleaded facts that plausibly state claims that the ADC officials have violated the plaintiffs' First Amendment rights by: (1) restricting the ability of execution witnesses to hear the sounds of the entire execution process; (2) failing to disclose the source and quality of the lethal-injection drugs that will be used in the inmates' executions; and (3) failing to disclose specific qualifications of the execution team members who will insert intravenous lines into the inmates.

I

Since the Supreme Court upheld the constitutionality of a three-drug protocol in *Baze v. Rees*, 553 U.S. 35 (2008), the State of Arizona has executed 14 prisoners by lethal injection.  During that time, the State has faced a series of legal challenges to its execution process.  A number of those challenges have involved whether its executions expose prisoners to needless pain in violation of the Eighth Amendment.  Although we have rejected the challenge each time, we have expressed serious concerns about the suffering caused by Arizona's lethal-injection process.  For instance, we noted that the execution of Robert Towery was "perilously close" to falling outside of the constitutional safe harbor created by *Baze*, given the length of time it took to place Towery's intravenous lines.  *Lopez v. Brewer*, 680 F.3d 1068, 1075 (9th Cir. 2012).

Members of our court have noted serious due process concerns with Arizona's execution procedures as well.  These concerns have largely involved the shroud of secrecy surrounding Arizona's execution proceedings and the State's pattern of deviating from its lethal-injection protocols at the last minute.  *See Lopez v. Brewer*, 680 F.3d 1084, 1094–95 (9th Cir. 2012) (Reinhardt, J., dissenting from denial of rehearing en banc).  For example, Arizona informed the court that it intended to use a one-drug protocol instead of a three-drug protocol less than 48 hours before Towery's execution.  *See Towery v. Brewer*, 672 F.3d 650, 652–53 (9th Cir. 2012).  Then, when carrying out Towery's execution, the State restricted public and attorney observation, prohibited Towery from describing the pain he experienced, and limited the notes recorded in the official execution log.  *See Lopez*, 680 F.3d at 1082–83 (Berzon, J., concurring in part and dissenting in part).  These practices

have constrained the ability of death-row inmates to challenge the constitutionality of Arizona's execution process, raising procedural due process concerns. *See id.* at 1083–84. This lack of information has also hampered judicial review and public evaluation of the process.

In 2014, six death-row inmates filed this 42 U.S.C. § 1983 action against various ADC officials in response to the problems described above. The inmates asserted, among other things, that they have a First Amendment right to detailed information regarding the drugs to be used in their executions and the qualifications of execution team members. *See Wood v. Ryan*, 759 F.3d 1076, 1079 (9th Cir.), *vacated*, 573 U.S. 976 (2014). Joseph Wood, one of the original plaintiffs in this action, filed a motion for a preliminary injunction seeking a stay of his impending execution until he obtained the requested information. Our court concluded that Wood had raised serious questions as to whether he was entitled to the requested information under the First Amendment and granted a conditional stay. *Id.* at 1080–86, 1088. The Supreme Court summarily vacated that decision.

Arizona executed Wood a day after the stay was vacated. Wood's execution was botched in several ways. According to the allegations in the plaintiffs' complaint, Wood rose up and gasped for air about 12 minutes into his execution, after first appearing to be sedated. He continued to struggle to breathe until he died, nearly two hours after the drugs were first administered. During that time, Wood was administered 15 doses of lethal-injection drugs, even though Arizona's protocol calls for only two. The execution team also failed to perform consciousness checks before each injection, as they were required to do. According to

journalists who attended the execution, Wood appeared to be in agony throughout the process.

After Wood's execution, the First Amendment Coalition joined the inmates in filing the First Amended Complaint. The parties agreed to stay the litigation until the ADC published a set of revised execution procedures. The district court lifted the stay after the new procedures were published, at which point the plaintiffs filed the operative Second Amended Complaint.

As relevant to this appeal, the plaintiffs challenge three of Arizona's practices under the First Amendment. We explain these practices in some detail below. The plaintiffs also asserted various Eighth Amendment, due process, and equal protection claims. Those claims have been dismissed or settled by the parties.

First, the plaintiffs claim that Arizona unconstitutionally restricts the ability of execution witnesses to hear the sounds of the entire execution process. Under Arizona's current procedures, witnesses observe the execution in a designated witness room adjacent to the execution room. Although this room has windows looking into the execution room, those windows are covered by curtains during the preliminary steps of the execution. Witnesses view the prisoner through closed-circuit monitors as he is secured on the table in the execution room, makes his last statement, and has intravenous lines inserted. During the initial procedures, the witnesses can listen to the sounds in the execution room through speakers connected to an overhead microphone.

After the intravenous lines are inserted, execution team members turn off the closed-circuit monitors and open the curtains to the execution room. They also turn off the overhead microphone. At that point, the witnesses can still

view the execution, but they can no longer hear the sounds from the execution room, other than in brief moments when execution team members turn on the execution-room microphone to give updates about the prisoner's level of consciousness. In their complaint, the plaintiffs seek an injunction that would allow witnesses to hear the sounds of the entire execution proceeding, from the time that the prisoner is brought into the execution room to the time of death.

Second, the plaintiffs claim that ADC officials have violated their First Amendment rights by failing to disclose certain information regarding the source and quality of the lethal-injection drugs that will be used in the inmates' executions. Arizona's procedures require the Department of Corrections to disclose some information about the drug protocol to be used in an execution. That information includes the chemical composition and dosages of the drugs, as well as the procedures for administering them. The procedures also require officials to ensure that the drugs are not expired and are properly stored. In their complaint, the plaintiffs request additional information regarding the manufacturers, sellers, lot numbers, National Drug Codes, and expiration dates of the drugs.

Third, the plaintiffs claim that ADC officials are violating the First Amendment by failing to disclose the qualifications of each execution team member who will insert intravenous lines into the inmates. Arizona's procedures require such individuals to be "currently certified or licensed within the United States" to place intravenous lines. The procedures specify that the individual may be a physician, physician assistant, nurse, emergency medical technician, paramedic, military corpsman, or any other certified or licensed personnel. The plaintiffs argue that

more specific information regarding each team member's qualifications is necessary because under the current procedures, an amateur with an online certificate would be authorized to insert the intravenous lines. The plaintiffs thus seek documentation from the ADC to establish that the execution team members who will insert intravenous lines are qualified to do so.

The plaintiffs advance two theories under the First Amendment to challenge the practices described above. They first challenge Arizona's practices as violating their First Amendment right of access to governmental proceedings. That right guarantees the public and the press a measure of access to governmental proceedings, to ensure that public discussion of governmental affairs is informed. *See Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604–05 (1982). Under this theory, the plaintiffs contend, ADC officials are violating the First Amendment by limiting access to the sounds of the execution process and by concealing information regarding execution drugs and personnel, thereby depriving the public of information necessary to have an informed debate about capital punishment in Arizona.

The plaintiffs also assert a separate claim under the First Amendment predicated on violation of the inmates' right of access to the courts. That right guarantees prisoners a meaningful opportunity to bring legal challenges to their sentences and the conditions of their confinement. *See Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). According to the complaint, ADC officials are violating the inmates' First Amendment rights by limiting their access to important information about the execution process, thus hindering their ability to challenge the constitutionality of their executions.

The district court dismissed the plaintiffs' First Amendment claims under Federal Rule of Civil Procedure 12(b)(6).  The court held that the right of access to governmental proceedings does not encompass either the right to hear the sounds of the execution process or the right to obtain the requested information regarding execution drugs and personnel.  The district court's decision turned largely on its reading of *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002), which held that the right of access to governmental proceedings includes the right to view executions in their entirety.  *Id.* at 873–77.  The district court construed the holding of that case as limited to the right to *view* executions, not the right to hear the sounds of executions or the right to obtain information regarding execution drugs and personnel.  The court also concluded that the plaintiffs had not plausibly alleged a historical tradition or the functional importance of access to execution sounds and information, as required by the relevant First Amendment test.

The district court rejected the plaintiffs' other First Amendment theory as well.  The court explained that the First Amendment right of access to the courts does not include the right to discover grievances.  In the court's view, the inmates are requesting access to execution sounds and information about execution drugs and personnel in order to discover whether they can assert a colorable Eighth Amendment claim.  The court concluded as a matter of law that the inmates are not entitled to such information under the First Amendment right of access to the courts.

II

We turn first to the claim that ADC officials have violated the plaintiffs' right of access to governmental proceedings.

## A

We conclude that the First Amendment right of access to governmental proceedings encompasses a right to hear the sounds of executions in their entirety.  We also conclude that on the facts alleged, Arizona's restrictions on press and public access to the sounds of executions impermissibly burden that right.  We thus reverse the district court's decision as to this restriction.

### 1

Our conclusion follows directly from the holding and reasoning of *Woodford*.  In that case, we considered a California regulation that prevented witnesses from observing the initial steps of the execution process, during which the prisoner is brought into the execution chamber, secured to the gurney, and has the intravenous lines inserted. *See Woodford*, 299 F.3d at 871.  We held that the public has a First Amendment right to view executions in their entirety. *See id.* at 877.  In reaching that conclusion, we applied the two-part test for analyzing whether a First Amendment right of access to governmental proceedings exists: (1) "whether the place and process have historically been open to the press and general public," and (2) "whether public access plays a significant positive role in the functioning of the particular process in question."  *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986) (*Press-Enterprise II*).  We determined that public viewing of executions in their entirety is rooted in historical tradition and that public observation plays a significant role in the functioning of capital punishment.  *See Woodford*, 299 F.3d at 875–77.  We therefore ruled that the public has a qualified First Amendment right to view executions in their entirety.

We first consider here whether the plaintiffs in this case have alleged facts that state a plausible claim that the ADC has violated their First Amendment right to hear the sounds of executions in their entirety. As in *Woodford*, we apply the *Press-Enterprise II* test to determine whether such a First Amendment right of access exists.

The historical tradition of public access described in *Woodford* includes the ability to hear the sounds of executions. In the Second Amended Complaint, the plaintiffs cite historical examples in which the public and the press were able to attend hangings with no barriers between the prisoners and witnesses. These allegations echo our reasoning in *Woodford*. We explained there that executions have historically been open to the press and the general public. *See id.* at 875–76. The crowds that gathered to watch those executions could, no doubt, hear the sounds of the entire execution process, even if not with perfect clarity.

The defendants argue that, even if that was the case, the plaintiffs are seeking an amplified sound broadcast from the execution room, which is not rooted in historical tradition. But that mischaracterizes the nature of the plaintiffs' request. Arizona has chosen to have witnesses view the events through a soundproof window. The plaintiffs are asking for the microphone in the execution room to be left on during the entire execution process not because they want amplified audio, but because they want witnesses to be able to hear the sounds as they would if they were viewing the execution directly rather than through a soundproof window.

The plaintiffs have also plausibly alleged that such access would play a significant role in the proper functioning of capital punishment. They allege that allowing witnesses to hear the sounds of the entire execution process will ensure informed and accurate media coverage of the event, which

in turn will help the public determine whether executions in Arizona are being carried out in a humane and lawful manner.  To support this allegation, they cite historical examples in which media coverage of executions has sparked public debate about the appropriate method of execution in Arizona.

The defendants argue that leaving the microphone on during the entire process will provide no additional benefit to the functioning of capital punishment in Arizona.  They point out that journalists were able to report on the choking and coughing sounds that Joseph Wood made during his execution under the State's current procedures.  However, although reporters could hear those sounds during the brief moments when Wood's execution team provided updates, they could not hear anything else in the nearly two hours it took for Wood to die.  Lifting Arizona's restriction on the witnesses' ability to hear would ensure more comprehensive coverage of executions in the State.

As we explained in *Woodford*, the plaintiffs have alleged a legally cognizable theory.  Execution witnesses need to be able to observe and report on the entire process so that the public can determine whether lethal injections are fairly and humanely administered.  *See id.* at 876.  Barring witnesses from hearing sounds after the insertion of intravenous lines means that the public will not have full information regarding the administration of lethal-injection drugs and the prisoner's experience as he dies.

2

Although we hold that, on the facts alleged, the public and the press have a constitutional right to hear the sounds of the entire execution process, that does not end our inquiry.  In *Woodford*, after we held that the public has a qualified

First Amendment right to view executions, we went on to analyze whether California's restriction on such observation impermissibly burdened that right. *See id.* at 885. We concluded that it did.

First, we determined that a deferential standard of review is appropriate in this context because executions take place inside prisons, and corrections officials must have broad discretion to carry out the complex task of prison administration. *See id.* at 877–79. We thus analyzed whether California's regulation was "reasonably related to legitimate penological objectives, or whether it represent[ed] an exaggerated response to those concerns." *Id.* at 878 (quoting *Turner v. Safley*, 482 U.S. 78, 87 (1987)). We explained that there needed to be a "closer fit" between the regulation and any legitimate penological objectives because the California regulation at issue did not leave room for case-by-case discretion. *See id.* at 879. The restriction categorically banned witnesses from viewing the initial procedures of executions, regardless of whether there were any specific security concerns.

We then considered the four factors relevant to the inquiry: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there are "obvious, easy alternatives . . . that fully accommodate[] the prisoner's rights at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 89–91 (internal quotation marks omitted). We concluded that the California viewing

restriction was not reasonably related to a legitimate penological interest and thus was unconstitutional. *See Woodford*, 299 F.3d at 879–85.

The same deferential standard of review applies here as well. As in *Woodford*, we are dealing with a regulation regarding executions that will take place inside a prison. *See id.* at 877–79. We consider the four relevant factors to determine whether Arizona's restrictions on access to the sounds of executions are reasonably related to legitimate penological objectives. As *Woodford* instructed, we require a "closer fit" between the restriction and any legitimate penological interests because the regulation does not allow for case-by-case discretion. *See id.* at 879. That is, Arizona imposes a categorical ban on hearing the sounds of executions after the intravenous lines are inserted, regardless of whether there are any specific security risks.

The plaintiffs have alleged facts that state a plausible claim that Arizona has unconstitutionally restricted the ability of witnesses to hear the sounds of executions, even under the deferential standard of review applied in *Woodford*. The defendants attempt to justify the restrictions by arguing that they have a legitimate penological interest in ensuring that execution team members are not publicly identified or attacked. But, according to the factual allegations in the plaintiffs' complaint, witnesses can hear sounds from the execution room as the execution team brings the prisoner into the room, secures him to the table, and inserts the intravenous lines. Thus, to the extent that execution team members could be identified by the sound of their voices, witnesses can already hear their voices during the initial stages of the execution. The defendants also argue that allowing witnesses to hear the sounds of the entire execution process could increase the risk of litigation and

cause execution team members to second-guess their actions. We reject this argument because Arizona does not have a legitimate penological interest in hampering efforts to ensure the constitutionality of its executions. The plaintiffs have thus plausibly alleged that there is no valid, rational connection between the regulation and cognizable governmental interests. *See Turner*, 482 U.S. at 89–90.

The plaintiffs have also plausibly alleged that, with Arizona's restrictions in place, there are no alternative means for the public to exercise the right to hear the sounds of executions in their entirety. *See id.* at 90. As we explained in *Woodford*, the public has a right to independent eyewitness accounts of the entire execution process. *See Woodford*, 299 F.3d at 883–84. Reports of executions by the same prison officials who carry them out are not adequate substitutes. *See id.* at 883.

Finally, the plaintiffs have plausibly alleged that there is an available, low-cost alternative to fully accommodate the First Amendment right: leaving the microphone in the execution room on throughout the entire process. *See Turner*, 482 U.S. at 90–91. This accommodation would not have a significant impact on guards, other inmates, or the allocation of prison resources. *See id.* at 90. According to the plaintiffs' allegations and Arizona's own records, a microphone is already set up to carry sounds from the execution room to the witness room during the initial stages of the execution process. Leaving the microphone on for the rest of the process would involve at most only a *de minimis* cost.

## B

The plaintiffs also assert that the First Amendment right of access to governmental proceedings entitles them to

information regarding the manufacturers, sellers, lot numbers, National Drug Codes, and expiration dates of lethal-injection drugs, as well as documentation regarding the qualifications of certain execution team members. We agree with the district court that neither the public nor the press has a First Amendment right of access to this information.

As the Supreme Court originally conceptualized it, the First Amendment right of access to governmental proceedings refers to the right of the public to attend and observe those proceedings. In the initial cases recognizing the right, the Court held that the public has the right to attend criminal trials, *see Globe Newspaper Co.*, 457 U.S. at 606; *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980) (plurality opinion), the jury-selection process, *see Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 512 (1984) (*Press-Enterprise I*), and preliminary hearings, *see Press-Enterprise II*, 478 U.S. at 13. In situations in which other interests justify the closure of a proceeding, the Court held that the public has a right to access a transcript of the proceeding within a reasonable time. *See Press-Enterprise II*, 478 U.S. at 13; *Press-Enterprise I*, 464 U.S. at 512. Our court has since extended the right of access to various documents filed in criminal proceedings. For example, we have held that the public has the right to access plea agreements, *see Oregonian Publishing Co. v. United States District Court*, 920 F.2d 1462, 1465–66 (9th Cir. 1990), documents filed in pretrial proceedings, *see Associated Press v. United States District Court*, 705 F.2d 1143, 1145 (9th Cir. 1983), and documents filed in post-conviction proceedings, *see CBS, Inc. v. United States District Court*, 765 F.2d 823, 825 (9th Cir. 1985).

The plaintiffs analogize information regarding execution drugs and personnel to the documents described above. They argue that the information is just as important to understanding executions as the documents at issue in our prior cases are to understanding criminal proceedings, and that the public therefore has a right of access to the information sought here. The plaintiffs correctly point out that we held that such a right likely exists in *Wood*, 759 F.3d at 1082–86, but that decision was summarily vacated by the Supreme Court.

We conclude that the requested information differs from the requested documents in precedential cases in material ways and that the public does not have a right of access to the information at issue here. As explained above, the Supreme Court has held that the public has a right of access to transcripts of various criminal proceedings. *See, e.g.*, *Press-Enterprise II*, 478 U.S. at 13 (preliminary hearing); *Press-Enterprise I*, 464 U.S. at 512 (jury-selection process). Information regarding execution drugs and personnel bears no resemblance to a transcript. It does not provide a descriptive account of the execution process, as a transcript would. The reason for providing the public with access to a transcript also does not apply here. The Supreme Court has explained that a transcript may serve as a substitute for holding an open governmental proceeding when other interests justify the closure of that proceeding. *See Press-Enterprise I*, 464 U.S. at 512. There is no need for a transcript in this context, since the public already has a right to attend and observe executions. *See Woodford*, 299 F.3d at 877.

Information regarding execution drugs and personnel also differs from other documents to which the public has a right of access. We have held that the public has the right to

access documents filed in certain judicial proceedings. *See, e.g.*, *Oregonian Publishing Co.*, 920 F.2d at 1465–66 (plea agreement and related documents); *CBS, Inc.*, 765 F.2d at 825 (documents filed in post-conviction proceedings); *Associated Press*, 705 F.2d at 1145 (documents filed in pretrial proceedings). Those documents are part of the official judicial record. *See CBS, Inc.*, 765 F.2d at 826. We have never held that the right of access extends to documents beyond those in the record just because they may shed light on a criminal proceeding. For example, we have never held that the First Amendment gives the public a right to access judicial conference notes or to all documents in the prosecutor's possession, and the Supreme Court has suggested that the First Amendment does not provide for such a right. *See Pell v. Procunier*, 417 U.S. 817, 833–34 (1974).

Unlike the documents to which the public has a right of access, the requested information is not part of any official record of the execution proceeding. It is simply information in the government's possession that would enhance the understanding of executions. But, as the Supreme Court has stated, the First Amendment does not "mandate[] a right of access to government information or sources of information within the government's control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (plurality opinion).

We also reject the plaintiffs' argument that the holding of *Woodford*—that the public has a right to *view* executions in their entirety—directly resolves this issue. According to the plaintiffs, in analogous medical settings, witnesses would be able to view drug labels and the nametags of medical personnel, which would allow them to observe information regarding the source of drugs and the qualifications of medical personnel. The plaintiffs argue that

knowing the source of the drugs would, in turn, provide information about the quality of the drugs. The plaintiffs thus contend that the right to view executions in their entirety includes the right to access the requested information regarding execution drugs and personnel.

*Woodford*'s holding does not extend that far. There, we held that the public and the press have the right to view executions in their entirety, "including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Woodford*, 299 F.3d at 877. We did not hold that there is a First Amendment right to examine executions in minute detail, such that witnesses could see the drug labels and the nametags of execution team members. Nor did we hold that the public is entitled to all information that is "inextricably intertwined" with executions. *Woodford* did not change the default rule that the right of access "does not extend to every piece of information that conceivably relates to a governmental proceeding, even if the governmental proceeding is itself open to the public." *Wood*, 759 F.3d at 1092 (Bybee, J., dissenting).

Other courts have reached the same conclusion. The Sixth Circuit concluded that the *Press-Enterprise II* test does not apply in this context, and held that the public does not have a First Amendment right of access to information regarding the identities of execution team members or the identities of entities that transport, manufacture, compound, or supply lethal-injection drugs. *See Phillips v. DeWine*, 841 F.3d 405, 417–20 (6th Cir. 2016). Similarly, the Eighth Circuit has held that the public does not have a First Amendment right to know the identities of the entities that supply and compound lethal-injection drugs. *See Zink v. Lombardi*, 783 F.3d 1089, 1111–13 (8th Cir. 2015). And the

Eleventh Circuit has held that the public does not have a right to know the qualifications of execution team members or the source of lethal-injection drugs. *See Wellons v. Commissioner*, 754 F.3d 1260, 1266–67 (11th Cir. 2014).

Given Arizona's checkered past with executions, we are troubled by the lack of detailed information regarding execution drugs and personnel. Such information would undoubtedly aid the public and death-row inmates in monitoring the constitutionality of Arizona's execution proceedings. However, as the Supreme Court has held, the First Amendment does not mandate the disclosure of "all the information provided by [freedom of information] laws." *McBurney v. Young*, 569 U.S. 221, 232 (2013). Thus, although the inmates may be able to assert a procedural due process right to obtain the information they seek, *see Lopez*, 680 F.3d at 1083–84 (Berzon, J., concurring in part and dissenting in part), neither the inmates nor the First Amendment Coalition possesses such a right under the First Amendment.

Because the First Amendment right of access to governmental proceedings does not entitle the plaintiffs to information regarding execution drugs and personnel as a matter of law, the district court did not abuse its discretion by dismissing with prejudice those aspects of the plaintiffs' claim relating to such information.

## III

We turn next to the plaintiffs' claim that Arizona's restrictions violate the inmates' First Amendment right of access to the courts. We agree with the district court that this claim fails as a matter of law.

We have held that there are two types of claims that can be raised in this context.  *See Silva v. Di Vittorio*, 658 F.3d 1090, 1102–04 (9th Cir. 2011), *overruled on other grounds by Coleman v. Tollefson*, 135 S. Ct. 1759 (2015).  The first category of claims involves the denial of adequate law libraries and other legal assistance to prisoners, which prevents them from challenging their sentences and the conditions of their confinement.  *See Hebbe*, 627 F.3d at 342–43.  The second category of claims involves active interference with a prisoner's right to litigate, such as seizing and withholding the prisoner's legal files.  *See Silva*, 658 F.3d at 1102–04.  Neither of those rights is implicated here, for the plaintiffs do not contend that Arizona officials have limited the inmates' ability to litigate in any way.

The Supreme Court has explained that the First Amendment right of access to the courts does not include the right of prisoners to "discover grievances[] and to litigate effectively once in court."  *Lewis v. Casey*, 518 U.S. 343, 354 (1996) (emphasis omitted).  That is what the inmates seek here.  According to the Second Amended Complaint, the inmates are seeking access to execution sounds and information regarding execution drugs and personnel in order to discover whether they have a colorable claim that their executions will be carried out in violation of the Eighth and Fourteenth Amendments.  The First Amendment right of access to the courts does not entitle the inmates to such information.  *See Phillips*, 841 F.3d at 420; *Zink*, 783 F.3d at 1108; *Wellons*, 754 F.3d at 1267.

Because the inmates' right-of-access-to-the-courts claim fails as a matter of law, the district court did not abuse its discretion by dismissing this claim without leave to amend.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

The parties shall bear their own costs.

---

BERZON, Circuit Judge, concurring in part and dissenting in part:

I join Parts I and II of the Court's opinion but dissent in part as to Part III.

For one of the initial plaintiffs in this case, any intervention we might now order may be entirely too late. The botched execution of Joseph Wood took one hundred and seventeen minutes. This Court had stayed Wood's execution, holding that, until Arizona provided the "name and provenance of the drugs to be used" and "the qualifications of the . . . personnel" to be enlisted, his execution threatened irreparable harm. *Wood v. Ryan*, 759 F.3d 1076, 1088 (9th Cir.), *vacated* 573 U.S. 976 (2014).[1] The State, we held, could not execute Wood as long as it continued to conceal "reliable information" about execution procedures which are "invasive, possibly painful, and may give rise to serious complications." *Id.* at 1085 (quoting *Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 876 (9th Cir.2002)). But despite Arizona's assurances that "nearly every detail" of its execution protocol had been made public, Wood's execution in fact deviated from that protocol in significant ways, culminating in the injection of thirteen more doses of lethal drugs than the protocol authorized. And despite the serious possibility that Wood's execution inflicted "needless suffering," *Baze v. Rees*,

---

[1] The Supreme Court vacated our stay of Wood's execution, so the *Wood* opinion is not precedential. I cite to the opinion as part of the historical record of Wood's execution.

553 U.S. 35, 50 (2008), Arizona has ensured that it remains unclear what went so tragically wrong—and why its assurances proved unreliable.

In seeking to prevent his likely-unconstitutional execution, Wood relied upon an eerily similar case: *Towery v. Brewer*, 672 F.3d 650, 661 (9th Cir. 2012). Robert Towery's execution had also deviated from Arizona's purported protocol, resulting in an hour-long ordeal as personnel struggled to set IV lines, doubtless producing considerable pain. *See Lopez v. Brewer*, 680 F.3d 1068, 1073–75 (9th Cir. 2012). In *Lopez*, this Court noted the tension between Arizona's "touting of the public nature of the execution" and its "shrouding" of crucial details of the execution process "in a cloak of secrecy." *Id.* at 1075. I separately argued that the "impenetrable roadblocks" erected by Arizona to obtaining such information denied death-row inmates their procedural due process right to have Eighth Amendment challenges heard at a meaningful time and in a meaningful manner, *Id.* at 1082 (Berzon, J., concurring in part and dissenting in part). Despite these admonitions, Arizona has continued to conceal the precise conditions of Towery's death.

These deviations in protocol are not isolated. In other executions, Arizona has obtained its lethal injection drugs illegally or administered them in unauthorized dosages. And on at least one occasion, the State issued a warrant of execution without compliance with provisions of its protocol which required it to ensure that that the drugs it planned to use had not expired, discovering its oversight only two days before the execution.

Arizona is now deploying a range of strategies to obstruct any effort to understand the difficulties which plague its executions. First, it grants those who carry out its

executions broad discretion to eliminate the access it ordinarily allows. Its protocol authorizes Arizona Department of Corrections ("ADC") officials to cut the microphone if the condemned, in making his final statement, makes any utterance which officials deem "vulgar[]" or "intentionally offensive." The threatened use of this discretion forced Towery to develop a code for communicating with his counsel from the execution chamber, a code by which he may have indicated that the execution procedures were causing him pain. *Lopez*, 680 F.3d at 1082 (Berzon, J., concurring in part and dissenting in part). The potential use of such a code in future executions is not a reassuring prospect, for ADC officials also retain discretion to close the window curtains of the execution chamber or to remove witnesses from the facility if they deem either course of action "merit[ed]" by a "legitimate penological objective."

Moreover, Arizona now withholds information concerning the source and quality of its lethal-injection drugs. ADC officials had previously provided this information, pursuant to a court order which they declined to appeal. The officials justify this change by invoking an interest in maintaining confidentiality for the sources of Arizona's lethal-injection drugs. But they offer no evidence that their previous compliance with the court order encumbered their administration of subsequent executions. *Wood*, 759 F.3d at 1086. Even assuming the legitimacy of the State's interest, that interest does not explain Arizona's choice to withhold the same sorts of information provided for previous executions, which would not compromise confidentiality. Disclosure of the drugs' expiration dates, for example, would not reveal the identities of their manufacturers. Given the poor fit between the changes Arizona has made to its execution procedures and the

reasons it has offered to justify them, we can only wonder, at this stage, as to Arizona's true objectives.

The remaining plaintiffs in this case now challenge as forbidden by the First Amendment the shroud of secrecy that Arizona maintains around its executions. While I join Parts I and II of the Court's opinion, I write separately to call attention to the inmates' plausible allegations that Arizona, through its deliberate concealment of information about its execution process, has violated their First Amendment right of access to the courts. I also write to reiterate my view that Arizona's approach to devising, announcing, and recording its execution procedures denies condemned inmates their right under the Fourteenth Amendment to procedural due process of law.

1. As the majority notes, this Court has recognized two types of access-to-courts claims: "those involving prisoners' right to affirmative *assistance*" and "those involving prisoners' rights to litigate without active *interference*." *Silva v. Di Vittorio*, 658 F.3d 1090, 1102 (9th Cir. 2011) (emphases in original), *overruled on other grounds by Coleman v. Tollefson*, 135 S. Ct. 1759 (2015). I agree with the majority that the inmates have not alleged facts that would give rise to a cause of action of the former type. As a First Amendment matter, they have no affirmative entitlement to information regarding the source, quality, storage conditions, or expiration dates of Arizona's lethal-injection drugs or the qualifications of its execution-team members.

But I part ways with the majority when it comes to the latter type of claim. The inmates have plausibly alleged that Arizona has concealed information in a deliberate effort to limit their ability to litigate the conditions under which they

will be put to death. If that is true, then Arizona has actively interfered with rights protected by the First Amendment.

The aforementioned distinction is not of the Ninth Circuit's making. In *Casey v. Lewis*, the Supreme Court made clear that the right of access to courts does not compel the state affirmatively to "enable the prisoner to *discover* grievances, and to *litigate effectively* once in court," 518 U.S. 343, 354 (1996), even as it acknowledged that the right *is* implicated where the state "hinder[s]" a prisoner's "efforts to pursue a legal claim," *id.* at 351. Other circuits have similarly recognized that access to the courts must be free from "undue interference," *Snyder v. Nolen*, 380 F.3d 279, 291 (7th Cir. 2004), in that the state "may not erect barriers that impede the right," *John L. v. Adams*, 969 F.2d 228, 235 (6th Cir. 1992). Cases involving this aspect of the right turn on the intention with which the state acts. The proscribed intention of interference might be pursued in any number of ways.

ADC officials urge that the inmates' access-to-courts claims fail as a matter of law because the inmates do not allege that they are "physically unable" to file Eighth Amendment claims, "only that they are unable to obtain the information needed to discover" a potential violation. *Williams v. Hobbs*, 658 F.3d 842, 852 (8th Cir. 2011). But the problem here is not that the inmates are unable to obtain any particular information; it is rather that the State is alleged to have *concealed* such information in a deliberate attempt to "hinder[]" their litigation efforts. *Casey*, 518 U.S. at 351.

We have never limited our "active interference" jurisprudence to interference with an inmate's ability (physical or otherwise) to file a claim. *See Silva*, 658 F.3d at 1102–03. Nor has the Supreme Court embraced such a limitation. In *Christopher v. Harbury*, plaintiff Jennifer

Harbury alleged a deprivation of her right of access to the courts where government officials intentionally deceived her by concealing information that her husband was being detained and tortured by foreign military officers who were paid agents of the Central Intelligence Agency. 536 U.S. 403, 405–08 (2002).  If not for the government's deception, Harbury argued, she "could have brought a lawsuit that might have saved her husband's life." *Id.* at 405. The Court rejected Harbury's argument, but not on the ground that the right of access to the courts cannot be violated by deliberate government concealment of information. Rather, Harbury's right-of-access claim failed because she had not identified an underlying cause of action that had been compromised as a result of the government's deception, nor had she sought any relief that would otherwise be unavailable in a subsequent lawsuit. *Id.* at 415, 418–22. Had she alleged a "nonfrivolous" underlying claim with which the government had interfered (one whose "arguable nature" offered "more than hope") and a remedy for the government's interference, her case could not have been dismissed. *Id.* at 416 (internal quotation marks omitted).

The inmates here, by contrast, *have* identified an underlying claim with which Arizona has allegedly interfered: that their impending executions threaten a serious "risk of severe pain," in violation of the Eighth Amendment. *Baze*, 553 U.S. at 61. Given plaintiffs' detailed allegations concerning the widespread difficulties involved in obtaining lethal-injection drugs, the considerable dangers posed by using drugs obtained from illegal sources or at unauthorized dosages, and Arizona's troubling history of deviating from its own lethal-injection drug protocols, including by obtaining its drugs illegally, administering them at unauthorized dosages, and failing to ensure appropriately that their expiration dates had not lapsed, the underlying

claim is assuredly not frivolous. *See Harbury*, 536 U.S. at 416. Indeed, given that deviations in protocol marked the executions of Robert Towery and Joseph Wood—executions which, for all that the State has permitted us to know, may well have inflicted more pain than *Baze* allows—the "arguable nature" of these claims offers "more than hope." *Id.* at 416.

The inmates have also sought an appropriate remedy: the demolition of those barriers which Arizona has erected in a deliberate attempt to interfere with their efforts to access the courts. The inmates have alleged, in copious detail, that Arizona has structured its protocol so as to maximize ADC officials' discretion to deviate from standard procedure, and that officials have repeatedly exercised this discretion on a last-minute basis, making meaningful judicial review near impossible. Moreover, the inmates allege that Arizona's previous use of a paralytic as part of its lethal-injection protocol may, *by design*, have served only to mask the pain suffered by those whom Arizona puts to death, preventing those still awaiting execution from sparing themselves similar pain. As Judge Reinhardt observed: "[I]f a skilled lawyer were instructing the state on how best to avoid *any* meaningful review of the constitutionality of its execution procedures, he would be hard pressed to improve on the unconscionable regime that the state has adopted." *Lopez v. Brewer*, 680 F.3d 1084, 1095–96 (9th Cir. 2012) (Reinhardt, J., dissenting from denial of rehearing en banc) (emphasis in original). Indeed, ADC officials themselves advance an interest in curtailing "the risk of litigation" as a legitimate purpose for adopting at least some of their policies. Against this backdrop, the inmates' assertion that Arizona has "deliberately conceal[ed]" critical information about its execution process, actively interfering with their access to the courts, is more than plausible.

Additional First Amendment issues may be raised by the State's admission that its concealment of the sources of its lethal-injection drugs is motivated by an interest in suppressing lawful protest directed at the drugs' manufacturers. But we need not reach such issues today. Arizona's alleged interference with the inmates' efforts to access the courts is sufficient.

To be sure, the inquiry into motivational subtleties which the "active interference" standard demands is not easily undertaken at the pleading stage. *See Silva*, 658 F.3d at 1103–04. The inmates have plausibly alleged Arizona's deliberate concealment of a range of information through barriers which take a variety of forms. On the merits, only those barriers proven to have been erected in a deliberate attempt to interfere with litigation efforts could violate the First Amendment. But the inmates must be permitted to make that showing. Today's opinion denies them that opportunity.

2. Were a procedural due process challenge before us, we could avoid such a searching inquiry into Arizona's intentions. We would ask whether Arizona's execution process deprives condemned inmates "the opportunity to be heard at a meaningful time and in a meaningful manner," regardless of what might motivate the deprivation. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). That the inmates are unable to litigate meaningfully their liberty interest in avoiding an unconstitutionally painful execution would be enough. *See Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003).

Relying upon procedural due process would offer the additional advantage of directing litigation efforts at the totality of the execution process. Rather than proceeding

barrier by barrier, parsing Arizona's reasons for adopting each one, we would ask whether the barriers, taken together, amount to a procedural due process violation.

This approach would also afford Arizona greater flexibility in correcting the constitutional deficiencies of its execution protocols. In *Lopez*, I wrote that Arizona might rectify its due process violations in any number of ways, "including (1) providing a detailed written protocol that restricts the Director's discretion and is actually followed in executions; (2) keeping and making available detailed accounts of the actual execution processes, including any evidence of the impact on the pain perception by those executed; (3) providing either for public access or for more limited access by counsel to the pre-execution proceedings." 680 F.3d at 1084 (Berzon, J., concurring in part and dissenting in part). It is disappointing that Arizona has continued to decline that invitation. Its adoption of any one of these suggestions would give the condemned inmates much of what they seek.

It may well be too late for Joseph Wood and Robert Towery to vindicate their First Amendment rights of court access or their rights to due process of law. If nothing changes, it might soon be too late for some remaining plaintiffs, as well.