# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

————————

No. 03-2979

————————

Reverend Larry Rice; Reverend     *
Raymond Redlich; New Life           *
Evangelistic Center, Inc.,             *
                                  *

         Appellants,       *    Appeal from the United States
                                *    District Court for the
     v.                      *    Eastern District of Missouri.
                                *
Gary Kempker; State of Missouri;   *
George Lombardi; Don Roper,     *
                                *
         Appellees.        *

————————

Submitted:   February 11, 2004
      Filed:   July 9, 2004 (Corrected July 15, 2004)

————————

Before LOKEN, Chief Judge, BOWMAN and WOLLMAN, Circuit Judges.

————————

BOWMAN, Circuit Judge.

Plaintiffs Reverend Larry Rice, Reverend Raymond Redlich, and New Life Evangelistic Center, Inc. (hereinafter collectively referred to as New Life) argue that the policy of the Missouri Department of Corrections banning cameras in the execution chamber violates plaintiffs' First Amendment rights of public access. The

District Court[1] disagreed and granted summary judgment for the defendants, all of whom are officials of the Missouri Department of Corrections (the Department). We affirm.

New Life requested permission from the Department to videotape the execution of convicted murderer Daniel Basile. The Department, acting through Director Gary Kempker and officials George Lombardi and Don Roper, applied the Department's Media Policy and denied New Life's request. The Media Policy states simply, "No cameras or tape recording device of any type shall be allowed in the witness area of the execution room or the surrounding area. However, each media witness representative shall be allowed to take paper, pencil and sketch pad to the witness area." Mo. Dep't of Corrs., Media Policy § 14B. New Life, alleging that the Media Policy violates the First Amendment, brought suit in the District Court seeking a declaratory judgment and an injunction to prevent the enforcement of the no-camera policy. At the summary-judgment stage of the ensuing proceedings, the defendants argued that the Media Policy did not violate any of the freedoms protected by the First Amendment. In the alternative, the defendants argued that if the Media Policy were found to infringe upon a constitutionally protected liberty, any such infringement was outweighed by legitimate penological interests and should be evaluated under the standards set forth in Turner v. Safley, 482 U.S. 78, 89 (1986). The District Court found that a ban on videotaping executions burdened New Life's constitutional right of access, but agreed with the defendants that the infringement was reasonable in light of legitimate penological concerns. Because we conclude that the Media Policy does not infringe on liberties protected by the First Amendment, we affirm the judgment of the District Court.

---

[1]The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

We review grants of summary judgments de novo, applying the same Rule 56 standards that govern all federal courts in their decisions on motions for summary judgment. See Fed. R. Civ. P. 56; Southern Union Co. v. Mo. Pub. Servs., 289 F.3d 503, 505 (8th Cir. 2002).

Initially, we must decide whether the execution of Daniel Basile has rendered the appeal moot. We agree with the District Court that the case is not moot and falls squarely within the "capable of repetition, yet evading review" exception to the mootness doctrine found in Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 515 (1911) (holding that a federal court may retain jurisdiction in an otherwise moot case if the challenged action is too short in duration for timely review and there is a reasonable expectation that the complaining party will be subject to the same action again). See Webster Groves School District v. Pulitzer Publishing Co., 898 F.2d 1371, 1373 (8th Cir. 1990). Both of the factors supporting the mootness exception exist in the present case: once all avenues for challenging a sentence of death have been exhausted, and a final execution order entered, the execution usually, as here, occurs within a rather short period of time, and it is very likely that New Life will seek to videotape another Missouri execution. Accordingly, the appeal is not moot.

We turn to the merits of the case. New Life argues that the First Amendment mandates that the public be allowed to videotape an execution. Seeking to persuade this Court to go where no court previously has gone, New Life relies on a two-step argument. The first step New Life asks us to take is to rule that the First Amendment, as interpreted by Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 (1980) (holding that the First Amendment requires criminal trials to be open to the public), requires executions to be open to the public. New Life then argues that prohibitions on videotaping are impermissible burdens on its constitutional right of access to executions. We find no need to engage in this two-part inquiry and instead address the issue directly and hold that the First Amendment does not protect the use of video

cameras or any other cameras or, for that matter, audio recorders in the execution chamber.

Because we hold that neither the public nor the media has a First Amendment right to videotape, photograph, or make audio recordings of government proceedings that are by law open to the public, we find it unnecessary to decide whether executions must be open to the public.[2] While Richmond mandates that criminal trials be open to the public, no court has ruled that videotaping or cameras are required to satisfy this right of access. Instead, courts have universally found that restrictions on videotaping and cameras do not implicate the First Amendment guarantee of public access. See Whiteland Woods v. Township of West Whiteland, 193 F.3d 177, 184 (3rd Cir. 1999) (holding that public has no right to videotape Planning Commission meetings that were required to be public); United States v. Kerley, 753 F.2d 617, 621 (7th Cir. 1985) (holding that the public has no right to videotape trial even when the defendant wishes it to be videotaped); Westmoreland v. Columbia Broadcasting System, Inc., 752 F.2d 16, 23 (2d Cir. 1984) ("There is a long leap, however, between a public right under the First Amendment to attend trials and a public right under the First Amendment to see a given trial televised."), cert.

---

[2]Currently, only one federal appeals court has addressed this issue squarely and has held that executions must be made public. See Cal. First Amend. Coalition v. Woodford, 299 F.3d 868, 877 (9th Cir. 2002); but cf. Holden v. Minnesota, 137 U.S. 483, 491 (1890) (holding that the Minnesota's restriction of access to executions did not violate the ex post facto clause). We need not decide this issue at this time because New Life was allowed to attend Daniel Basile's execution, and the Department does not seek to prevent the public from attending executions, even though space limitations may result in the exclusion of some members of the public who might wish to attend. In any event, state law requires, inter alia, that at least eight members of the public attend each execution. Mo. Rev. Stat. § 546.740. The record reveals that the viewing room of the execution chamber in the Missouri State Penitentiary at Potosi, where Missouri executions are carried out, accommodates at most approximately thirty-one spectators.

denied, 472 U.S. 1017 (1985); United States v. Hastings, 695 F.2d 1278, 1284 (11th Cir.), cert. denied, 461 U.S. 931 (1983) (holding that the press had no right to videotape criminal trials); cf. Nixon v. Warner Communications Inc., 435 U.S. 589, 609 (1978) (holding that no First Amendment right existed to publish or copy exhibits displayed in court); United States v. McDougall, 103 F.3d 651, 659 (8th Cir. 1996), cert. denied, 522 U.S. 809 (1997) (holding that First Amendment right of access does not extend to videotaped deposition testimony of then-President Clinton). As the Second Circuit has observed, "the First Amendment right of access is limited to physical presence at trials." United States v. Yonkers Bd. of Educ., 747 F.2d 111, 113 (2d Cir. 1984). Based on the overwhelming weight of existing authority, as well as on our general understanding of First Amendment principles, we hold that the Media Policy banning the use of video cameras and other cameras in the execution chamber does not burden any of New Life's First Amendment rights.

Arguments that the solemnity of executions requires additional modes of access that include the use of video cameras are not persuasive. Courts presented with the specific question of whether video cameras may be banned from the execution chamber have consistently held that such bans do not violate the First Amendment. See Garret v. Estelle, 556 F.2d 1274 (5th Cir. 1977), cert. denied, 438 U.S. 914 (1978); Entm't Network, Inc. v. Lappin, 134 F. Supp. 2d 1002 (S.D. Ind. 2001); Lawson v. Dixon, 446 S.E.2d 799 (N.C. 1994); Halquist v. Dep't of Corrs., 783 P.2d 1065 (Wash. 1989). In Garret, a television-news cameraman brought a First Amendment challenge against a prohibition on the use of television cameras and audio-visual equipment in the execution chamber. Garret, 556 F.2d at 1275. The Fifth Circuit upheld the prohibition and found no First Amendment right to televise or videotape executions. The Garret court observed that "[w]hile we agree that the death penalty is a matter of wide public interest, we disagree that the protections of the [F]irst [A]mendment depend upon the notoriety of an issue." Id. at 1279. We find the reasoning of Garret persuasive. Moreover, even if we were to assume arguendo that executions are so important that public access is required, we believe that

videotaping and the use of cameras would not be necessary to vindicate the right of access.

Because Missouri executions take place within prisons, we are also mindful of the Supreme Court's decision in Houchins v. KQED, Inc., 438 U.S. 1 (1978). The Supreme Court in Houchins vacated an injunction granted by a district court that required prison officials to give the press access to a notorious area of a prison and to allow the taking of photographs and the use of television cameras. Id. at 15-16. The Supreme Court ruled that the reporters had no First Amendment right to bring and use television cameras and other cameras within the prison.[3] New Life similarly has no First Amendment right to bring video cameras into the Potosi Correctional Center and the execution chamber contained within its walls.

New Life attempts to sidestep the Garret decision and Houchins by claiming status as a member of the public rather than as a member of the press.[4] New Life argues that Houchins does not control and that Garret is irrelevant insofar as New Life is not a member of the press. New Life asserts that because the press in Garret and Houchins attempted to claim additional privileges not enjoyed by the public, the holdings in those cases do not apply to New Life as a member of the public. We are unpersuaded. In Pell v. Procunier, 417 U.S. 817 (1974), and its companion case, Saxbe v. Washington Post Co., 417 U.S. 843 (1974), the Supreme Court, in holding that the press had no right to interview specific prison inmates, explained that the press enjoyed no special right of access to information not enjoyed by the public.

---

[3]A concurring opinion by Justice Stewart indicated the possibility that cameras or pictures may be required for the press to fulfill its First Amendment function in certain situations. Houchins, 438 U.S. at 17, (Stewart, J., concurring). But New Life has eschewed any status as a member of the press, as discussed *infra*, so we need not consider the force or validity of Justice Stewart's suggestion.

[4]We note that New Life Evangelical Center, Inc. owns and operates television and radio stations in Missouri, Kansas, Illinois and Arkansas.

-6-

New Life attempts to turn this principle on its head and argue that as a member of the public, they enjoy a special right of access not available to the reporters in Garret and Houchins. We disagree and conclude that whether New Life holds itself out as a member of the public or the press, it does not enjoy a First Amendment right to videotape executions.

The Media Policy's ban on videotaping perhaps could be considered a "content-neutral time, place, and manner" restriction on speech. A "time, place, and manner" restriction on speech may be upheld if it "serves a substantial governmental interest and do[es] not unreasonably limit alternative avenues of communication." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47 (1986). The defendants have offered several substantial governmental interests involving the safety and security of the prison, a set of interests of the sort that long has been given considerable deference by federal courts. See Turner, 482 U.S. at 84-85. The ban on videotaping does not prevent New Life from disseminating to the public any information gained from attending the execution. As a "content-neutral time, place, and manner" restriction on speech, the Media Policy does not violate the First Amendment.

Even if we were to agree with New Life (and the District Court) that the Media Policy burdens a constitutional right, we would be inclined to agree with the District Court's application of the Turner factors to evaluate the reasonableness of the policy. The District Court found the restriction on videotaping reasonably related to legitimate penological interests such as safety and security, and the court was satisfied that the Turner factors–a valid rational connection, available alternative avenues of exercising constitutional rights, an increased burden on prison resources and prison safety, and, finally, the unavailability of a less-burdensome alternative–were all met by the showing made by the defendants. Turner, 482 U.S. at 89-90. Because we find no constitutional right was burdened by the restriction on video cameras we need not review this portion of the District Court's opinion, but do mention it for the sake of completeness. We observe that New Life's argument that

the <u>Turner</u> standards for evaluating reasonableness should be used only when a <u>prisoner's</u> rights have been implicated has been foreclosed by the Supreme Court: "We do not think it sufficient to focus, as respondents urge, on the identity of the individuals whose rights allegedly have been infringed . . . any attempt to forge separate standards for cases implicating the rights of outsiders is out of step with [past Supreme Court precedent]." <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 410 n.9 (1989) (internal citations omitted). Contrary to New Life's assertions, the status of a person as a prisoner or non-prisoner does not determine whether the <u>Turner</u> test applies to prison regulations that may affect both prisoners and non-prisoners.

We also agree with the District Court's determination that the Media Policy is a valid exercise of authority granted by state law to the Director of the Department of Corrections. Specifically, Missouri Revised Statutes § 217.025 gives the Director broad authority to create rules and regulations to govern the operation of Missouri correctional centers and to control and safeguard their inmates. Mo. Rev. Stat. § 217.025 (2000). We are satisfied that the Media Policy is a valid exercise by the Director of this statutory authority.

Finally, we find no merit in New Life's claims that the District Court abused its discretion by denying New Life's motion to strike the affidavits of defendants Gary Kempker and George Lombardi under Federal Rules of Civil Procedure 26(a)(2). New Life claims that the affidavits provided expert opinions and that the failure to identify Kempker and Lombardi as experts require the affidavits to be struck. Because the affidavits contain factual material and merely lay opinion based on the defendants' personal knowledge gained from their work in the Department of Corrections, the District Court did not abuse its discretion in ruling that Kempker and Lombardi were not subject to the identification requirement of Rule 26(a)(2), and, consequently, in denying the motion to strike.

For the reasons stated, the judgment of the District Court is affirmed.

_____