**FOR PUBLICATION**
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**FILED**

MAY 12 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| GERALD ROSS PIZZUTO, Jr.; THOMAS E. CREECH,<br><br>Plaintiffs-Appellants,<br><br>v.<br><br>JOSH TEWALT, Director, Idaho Department of Correction, in his official capacity; CHAD PAGE, Chief, Division of Prisons, Idaho Department of Correction, in his official capacity; TYRELL DAVIS, Warden Maximum Security Institution; UNKNOWN EMPLOYEES, AGENTS, OR CONTRACTORS OF THE IDAHO DEPARTMENT OF CORRECTION, in their official capacities,<br><br>Defendants-Appellees,<br><br>and<br><br>BRAD LITTLE, Idaho State Governor, in his official capacity,<br><br>Defendant. | No. 20-36044<br><br>D.C. No. 1:20-cv-00114-DCN<br><br>OPINION |

Appeal from the United States District Court
for the District of Idaho
David C. Nye, Chief District Judge, Presiding

Argued and Submitted April 5, 2021
Seattle, Washington

Before: Ronald M. Gould, Johnnie B. Rawlinson, and Mark J. Bennett, Circuit Judges.

Opinion by Judge Bennett;
Partial Concurrence and Partial Dissent by Judge Gould

BENNETT, Circuit Judge:

Plaintiffs Gerald Pizzuto and Thomas Creech, two prisoners on Idaho's death row, seek information concerning Idaho's execution procedures. They do not in this action claim that their execution will be unconstitutional; rather, they claim that the deprivation of information itself constitutes a violation of their constitutional and statutory rights under 42 U.S.C. § 1983. The district court dismissed all their claims as unripe. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse and remand.

I.

In 1985, Pizzuto robbed and killed Berta and Delbert Herndon at a campground near the town of McCall, Idaho. *State v. Pizzuto*, 810 P.2d 680, 686–87 (Idaho 1991), *overruled on other grounds by State v. Card*, 825 P.2d 1081, 1088 (Idaho 1991). He was convicted of two counts of first-degree murder and sentenced to death. *Id.* at 687. His sentence was upheld on direct appeal in 1991. *See id.* at 716. Creech was serving a life sentence for two counts of first-degree murder at the Idaho State Correctional Institution when he killed fellow inmate David Dale Jensen in 1981. *State v. Creech*, 670 P.2d 463, 465 (Idaho 1983); *see also State v. Creech*,

2

589 P.2d 114, 115 (Idaho 1979) (per curiam).  He pleaded guilty to first-degree murder for killing Jensen and was sentenced to death.  *Creech*, 670 P.2d at 465–66.  This court ultimately granted habeas relief and the case was remanded for resentencing.  *Creech v. Arave*, 947 F.2d 873, 888 (9th Cir. 1991), *rev'd in part by* 507 U.S. 463 (1993).  On remand, the trial court resentenced Creech to death, and the death sentence was upheld by the Idaho Supreme Court in 1998.  *See State v. Creech*, 966 P.2d 1, 6, 23 (Idaho 1998).

Both Pizzuto and Creech are close to exhausting their post-conviction appeals.  On February 3, 2021, the Idaho Supreme Court affirmed the denial of Pizzuto's motion to alter the judgment on his fifth petition for post-conviction relief.  *Pizzuto v. State*, --- P.3d ---, 2021 WL 358204 at *1 (Idaho Feb. 3, 2021).[1]  That decision will become final if Pizzuto does not file a certiorari petition to the United States Supreme Court or he files such a petition and it is resolved in Idaho's favor.  Pizzuto has no pending federal post-conviction proceedings,[2] and this court affirmed the denial of his most recent habeas petition in *Pizzuto v. Yordy*, 947 F.3d 510 (9th Cir. 2019) (per curiam), *cert. denied* 141 S. Ct. 661 (2020).  *See id.* at 514.  Creech filed a federal habeas petition in 1999 that was denied by the district court.  Creech's

[1] On April 29, 2021, while this appeal was pending, the Idaho Supreme Court denied Pizzuto's petition for rehearing and issued a remittitur.

[2] Pizzuto has since filed an original habeas petition and an application for a stay of execution in the United States Supreme Court.  That proceeding was initiated May 10, 2021, after the issuance of Pizzuto's death warrant.

appeal is scheduled for argument before this court in September 2021. At the time

of this appeal, there was no outstanding death warrant for either Pizzuto or Creech.[3]

In Idaho, lethal injection is the sole method of execution. Idaho Code § 19-

2716. The execution must take place no more than thirty days after the issuance of

a death warrant. *Id.* § 19-2715(2). All other matters relating to execution

procedures, including the drugs to be used in the execution, are delegated to the

Director of the Idaho Department of Correction ("IDOC"). *Id.* § 19-2716. Pursuant

to this authority, IDOC publishes an execution protocol called the Standard

Operating Procedure ("SOP") that explains the procedures and drugs the state will

use. At the time Pizzuto and Creech filed this lawsuit, the extant SOP ("SOP 135")

had been last updated on January 6, 2012. Idaho's last execution took place on June

12, 2012.

In December 2018, Pizzuto and Creech's attorneys wrote to the Director

seeking information related to IDOC's execution protocol. As relevant to this

appeal, they sought the following:

> (1) the number, amount, and type of drugs to be used, (2) how the drugs were
> made, how the drugs were/would be obtained, their source, amounts,
> expiration date, how they were/would be acquired/transported/stored/tested,
> when IDOC would obtain the drugs, etc., (3) whether/when a new version of
> SOP 135 would be issued . . . (4) whether witnesses would be able to observe

---

[3] Idaho death warrants expire after thirty days, *see* Idaho Code § 19-2715(2), and all prior death warrants have long expired. On May 6, 2021, following the Idaho Supreme Court's remittitur, the Idaho district court issued a death warrant for Pizzuto, with a scheduled execution date of June 2, 2021.

4

the insertion of the IVs [intravenous lines], (5) procedures for IV placement/length, (6) who would participate in the execution, what was their training/qualifications, and how would they be chosen, (7) whether there would be a consciousness check and the procedure for it, and (8) procedures for botched executions.

Plaintiffs claim this information is essential to prevent a botched execution. For example, they claim the type of drug that will be used is important because "[t]here have been significant questions raised about the efficacy of certain drugs used in executions." Pizzuto and Creech contend this information is especially important to them as both have significant health issues. Pizzuto has had multiple heart attacks and is currently on several medications that would render certain execution drugs ineffective. Creech suffers from brain damage that may cause atypical reactions to certain drugs, and he also takes various medications. Plaintiffs claim the source of a drug also matters because some execution drugs are obtained from compounding pharmacies, which are more susceptible to error than FDA-approved manufacturers. In addition, plaintiffs describe several botched executions that resulted from human error. Thus, they claim that it is critical they know the identities and credentials of the personnel tasked with preparing and injecting the execution drugs.

IDOC did not provide plaintiffs' counsel with the answers they sought, and instead directed them to SOP 135. Unsatisfied, counsel arranged an in-person meeting with IDOC in June 2019, from which counsel gathered that SOP 135 would be revised prior to any execution. Subsequent communications between IDOC and

5

plaintiffs' counsel did not result in counsel obtaining the information they wanted. In late 2019, Pizzuto and Creech tried various administrative channels to obtain further information about their executions, but those attempts also proved unsuccessful.

Pizzuto and Creech then brought this § 1983 suit against various IDOC officials, alleging multiple violations of their rights. Their claims are: (1) the deprivation of execution-related information violates their First and Fourteenth Amendment rights to access government proceedings; (2) the deprivation of execution-related information violates their First Amendment right to petition the government for redress of grievances; (3) the absence of a "real" execution protocol constitutes cruel and unusual punishment in violation of the Eighth Amendment; (4) the deprivation of execution-related information violates their right to due process under the Fourteenth Amendment; (5) the absence of a "real" execution protocol (and, in the alternative, the discretion vested in the Director by SOP 135) violates the Equal Protection Clause; (6) the deprivation of execution-related information violates their statutory right to counsel under 18 U.S.C. § 3599; (7) the Director's authority to issue execution protocols is unconstitutional under various provisions of the Idaho Constitution; (8) the Director's refusal to issue a revised SOP violates his obligations under Idaho law; and (9) the deprivation of information creates a substantial risk of serious harm, which violates the Eighth Amendment. They seek

to enjoin the executions until the purported violations are remedied.

The district court dismissed plaintiffs' claims without prejudice, finding they were not ripe for adjudication. The court reasoned that both Pizzuto and Creech had pending post-conviction appeals, and thus "the ultimate question of whether the two men will even be executed remains an undetermined and open question." Plaintiffs timely appealed and sought expedited briefing, which we granted.

On March 30, 2021, while plaintiffs' appeal was pending, IDOC revised its execution protocol.[4] The revised SOP provides IDOC with four alternative methods of execution.[5] The first method is a three-drug protocol using sodium pentothal, pancuronium bromide, and potassium chloride. The second method is also a three-drug protocol, but it replaces sodium pentothal with pentobarbital. The other two methods are single-drug protocols, one using sodium pentothal and the other using pentobarbital. The method selected for an execution depends on the availability of chemicals, but the SOP allows for "no deviation from the procedures, protocols, and chemicals . . . without prior consent from the Director."

II.

---

[4] The revised SOP is publicly available on IDOC's website. *See* http://forms.idoc.idaho.gov/WebLink/0/edoc/283090/Execution%20Procedures.pdf . It consists of a document titled "Execution Procedures" that incorporates by reference the "Execution Chemicals Preparation and Administration" document, a witness agreement form, and a summary of the procedures.

[5] The four methods of execution have not changed significantly from the 2012 version of the SOP.

We begin with a discussion of the ripeness framework we apply. The ripeness doctrine is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Poland v. Stewart*, 117 F.3d 1094, 1104 (9th Cir. 1997) (citation omitted). It contains both constitutional and prudential aspects. *See Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993) ("[The] ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."). Constitutional ripeness requires that the case "present issues that are definite and concrete" and "is often treated under the rubric of standing because ripeness coincides squarely with standing's injury in fact prong." *Safer Chems., Healthy Fams. v. EPA*, 943 F.3d 397, 411 (9th Cir. 2019) (citation omitted). Thus, "[w]here there is no danger of imminent and certain injury to a party, an issue has not matured sufficiently to warrant judicial intervention." *Poland*, 117 F.3d at 1104 (quotation marks and citation omitted). Prudential ripeness considers "the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration." *Alaska Right to Life Pol. Action Comm. v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007) (citation omitted).

The district court held that whether Pizzuto and Creech would be executed at all was an "undetermined and open question, rendering the claims in this case speculative and abstract." The court rested its decision solely on the fact that both

8

Pizzuto and Creech have ongoing post-conviction litigation, the outcome of which remains uncertain. We review de novo the district court's dismissal for lack of ripeness. *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009). We reject the district court's reasoning.

The district court's bright-line rule effectively compels a result that we have repeatedly and emphatically directed plaintiffs to avoid. In the district court's view, plaintiffs' claims will become ripe only after their post-conviction proceedings have concluded. At that time, the state will also be able to issue a death warrant. *See Harris v. Johnson*, 376 F.3d 414, 417 (5th Cir. 2004) (per curiam) ("The denial of certiorari [on a federal habeas petition] . . . entitle[s] the state to set a date for, and proceed with, [plaintiff's] execution."). Thus, plaintiffs will frequently be litigating their claims within the small window of time after their death warrants are signed and before their execution dates (which, in Idaho, is thirty days). In situations like this, where plaintiffs raise eleventh-hour challenges to their executions, courts have routinely denied stays of execution because the plaintiffs did not raise their claims *earlier*. *See Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 503 U.S. 653, 653–54 (1992) (per curiam); *Cooper v. Rimmer*, 379 F.3d 1029, 1032 & n.2 (9th Cir. 2004) (per curiam); *McKenzie v. Day*, 57 F.3d 1461, 1468 (9th Cir. 1995). That, of course, suggests that the claims *would* have been ripe had they been brought earlier. If we accepted the district court's reasoning, we would be presenting prisoners on death

9

row an unsolvable dilemma—if they file before post-conviction litigation concludes, they are too early, and if they file after post-conviction litigation ends and the death warrant issues, they are too late. And so perhaps for that reason, we have not applied the ripeness rule advanced by the district court and have instead decided § 1983 claims similar to the ones here on the merits, even though plaintiffs had pending post-conviction proceedings. *See, e.g.*, *First Amend. Coal. of Ariz., Inc. v. Ryan*, 938 F.3d 1069, 1075–80 (9th Cir. 2019) (deciding the claims of Charles Hedlund, who had pending post-conviction appeals at the time, *see Hedlund v. Arizona*, 140 S. Ct. 1270 (2020) (mem.)).

Idaho alternatively contends that plaintiffs' claims are unripe because there is no current death warrant for either Pizzuto or Creech.[6] We agree that the issuance or lack of a death warrant is important (perhaps crucial) to determining ripeness in the context of other challenges to executions. When a prisoner claims that his execution will violate the Eighth Amendment because he is not competent to be executed, that claim becomes "'unquestionably ripe' only after it [is] clear that he 'would have no federal habeas relief for his conviction or his death sentence, and the Arizona Supreme Court issue[s] a warrant for his execution.'" *Beardslee v.*

---

[6] Idaho raised this issue before the district court, but the court did not reach it. At the time, there was no current death warrant for either plaintiff. Idaho has since issued a death warrant for Pizzuto, but that does not alter our analysis because we conclude that the ripeness of plaintiffs' claims does not depend on the issuance of a death warrant.

*Woodford*, 395 F.3d 1064, 1069 n.6 (9th Cir. 2005) (per curiam) (quoting *Stewart v. Martinez-Villareal*, 523 U.S. 637, 643 (1998)). But that is because a *Ford* claim depends on the mental competence of the prisoner *at the time of his execution*. *See Ford v. Wainwright*, 477 U.S. 399, 406–07 (1986); *In re Campbell*, 874 F.3d 454, 460 (6th Cir. 2017) (per curiam) ("Under [*Ford*], the road from sanity to insanity ordinarily being a one-way street, a sentence of death—although legally pronounced—cannot legally be carried out."). Without a death warrant or some other indicator of the execution date, the court does not know what the petitioner's mental competence will be at the time of execution, and any judgment it makes would be entirely hypothetical. *See Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1260 (11th Cir. 2009) (per curiam) ("[T]he facts to be measured or proven [in a *Ford* claim]—the mental state of the petitioner at the time of execution—do not and cannot exist when the execution is years away."). Thus, the issuance of a death warrant is essential to the ripeness of a *Ford* claim because only at that point does a *Ford* claim become concrete. *Cf. Jones v. Kelley*, 854 F.3d 1009, 1013 (8th Cir. 2017) (per curiam) (noting that the ripeness rule for *Ford* claims "does not necessarily extend to all claims that an inmate is unfit to be executed").

Requiring a death warrant here would ignore Pizzuto and Creech's claims in this case. For example, they contend that Idaho's failure to provide them sufficient information now, and failure to have a "real" execution protocol now, violates their

constitutional rights now. Those claims may be meritless, but they are not unripe. Whether Idaho's refusal to respond to certain inquiries and supposed refusal to promulgate a "real" execution protocol violate plaintiffs' constitutional rights *now* is readily determinable *now*. At argument, plaintiffs' counsel agreed that the claims allege "a constitutional right to know which path [the state is] going to choose [to execute plaintiffs] *right now as we speak*." A court simply needs to examine the law to determine if plaintiffs' alleged rights exist and, if so, find the facts necessary, if any, to determine if those rights have been violated. Moreover, withholding judicial consideration at this juncture would impose severe hardships on plaintiffs. Pizzuto and Creech have been on death row for decades and are near the end of their appellate and collateral proceedings. The window of opportunity for them to seek information about their execution is small and shrinking by the day.[7] And although Idaho argues this case is unripe, we do not see how the state will suffer hardship if the court decides plaintiffs' claims now. If anything, an earlier decision would give the state an opportunity to address any deficiencies in its revised SOP (assuming the plaintiffs' claims have some merit) prior to issuing a death warrant—or would have given such an opportunity in the case of Pizzuto. *See supra* n.3.

---

[7] Withholding decision on their claims until a death warrant issues would only narrow that window further—to the span of thirty days, or less. *See* Idaho Code 19-2715(2).

That is not to say death-row inmates can always ask the court to review their claims challenging the state's failure to provide information. Inmates whose sentences only recently became final might not face execution for decades, given the lengthy nature of post-conviction proceedings that are available to them. If a court were to decide claims at that early stage, its decision would have little impact as the inmates' (and the state's) circumstances evolved. However, we need not decide today where to draw the line between unripe and ripe claims for inmates who contend that the state has violated their rights by withholding information. Wherever that line is, Pizzuto and Creech's claims are well past the point of ripeness. Idaho acknowledges that both plaintiffs are nearing the end of their post-conviction appeals, has given no indication it intends to halt plaintiffs' executions, and has recently issued a revised execution protocol that will almost certainly govern their executions.

We find the presence of an extant execution protocol here a particularly relevant marker for ripeness because many of plaintiffs' claims assert rights to execution-related information, and the protocol is how Idaho has chosen to convey such information to death-row inmates.[8] Although plaintiffs accurately state that

---

[8] Plaintiffs bring a variety of other claims, some asserting that the absence of a protocol is a violation of their rights or that IDOC's authority to issue protocols is itself unconstitutional. Those claims are clearly ripe whether or not Idaho has issued a revised protocol. However, as plaintiffs' counsel acknowledged at oral argument,

13

this case is not a "method of execution" case, the ripeness rule we apply in method of execution cases is instructive. When a prisoner claims that a particular method of execution constitutes cruel and unusual punishment in violation of the Eighth Amendment, that claim becomes ripe when the method is chosen. *See Beardslee*, 395 F.3d at 1069 n.6 (citing *LaGrand v. Stewart*, 170 F.3d 1158, 1159 (9th Cir. 1999)). In *Poland v. Stewart*, 117 F.3d 1094, we held that a prisoner's claim that execution by lethal gas violated the Eighth Amendment would be ripe only once the prisoner affirmatively chooses lethal gas as the method of his execution, as opposed to the state's default method of execution by lethal injection. *Id.* at 1104. Absent such a decision, the prisoner "does not currently face any risk of execution by lethal gas and will face no hardship or immediate or certain danger if we do not review his Eighth Amendment lethal gas claim at this time." *Id.* Likewise, when plaintiffs claim that a state's execution protocol violates their rights to execution-related information, the state's decision to choose a protocol (the revised SOP) strongly suggests the claim is ripe.[9] At that point, the state establishes how it will execute plaintiffs and how much information it will provide plaintiffs, which the court can

---

plaintiffs' most important claims assert a right to information about how they will be executed (under multiple theories).

[9] The protocol usually specifies the method of execution. We need not decide whether Idaho's provision of four alternative methods of execution affects the ripeness of a method of execution claim, because plaintiffs have not alleged a method of execution claim.

14

then review.  While it is true that the revised SOP may be revised again, that concern applies to every government policy or law, and the mere possibility that a protocol may change is not enough to make plaintiffs' claims unripe.[10]  *See Whitaker v. Collier*, 862 F.3d 490, 493 (5th Cir. 2017) ("[T]he current protocol is presumably the means that Texas will select for their execution." (quotation marks and citation omitted)).  Rather, there must be some indication that the extant protocol will not be the protocol that governs plaintiffs' executions, and no such suggestion exists here.

However, we note that the *absence* of an extant protocol is sometimes, but not always, helpful for determining ripeness.  We are wary of assigning dispositive weight to the absence of an extant protocol, because to do so would encourage states to withhold their protocols until the last moment to minimize judicial scrutiny.  Thus, there may be instances where the lack of a protocol has little correlation to the state's intention to execute the plaintiff, and thus has little bearing on ripeness.  But in many situations, the absence of a protocol simply suggests that the state does not expect to imminently execute the plaintiff because it doesn't yet know how it plans to conduct the execution.  In those cases, it would be difficult and premature for a court to decide whether the state's nonexistent plan has violated any of plaintiffs' rights.  *See Payton v. Cullen*, 658 F.3d 890, 893 (9th Cir. 2011) (dismissing as unripe plaintiffs'

---

[10] In *Beardslee*, we left open the question of how to determine ripeness when the execution protocol is subject to change.  395 F.3d at 1069 n.6.

15

challenge to California's execution protocol, because the extant protocol had been judicially invalidated and no new protocol had been issued); *Andrews v. Davis*, 944 F.3d 1092, 1122 n.16 (9th Cir. 2019) (en banc). Thus, it is possible that plaintiffs' challenges to SOP 135 were unripe when first filed, because IDOC had allegedly represented it would not proceed under SOP 135 to execute plaintiffs and had not issued a replacement protocol. But that is no longer the case.

Idaho acknowledges that both Pizzuto and Creech are close to exhausting their post-conviction appeals and intends to proceed with plaintiffs' executions.[11] Plaintiffs claim the state's refusal to provide certain information violates their rights now. And the state has issued a revised execution protocol, from which the court can readily determine now whether plaintiffs' alleged rights, if they exist, have been violated. In these circumstances, plaintiffs' claims are ripe.

III.

Given the unusual timeline of events in this case, we must also consider mootness. "[W]e have an independent obligation to address whether a case is moot because it goes to the Article III jurisdiction of this court." *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 933 (9th Cir. 2008). "A claim is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Id.* (citation omitted). Dismissal on mootness grounds is

---

[11] Counsel for Idaho conceded at argument that plaintiffs' executions are imminent.

16

"justified only if it [is] absolutely clear that the litigant no longer ha[s] any need of the judicial protection that it sought." *Id.* (citation omitted).

When plaintiffs initially filed suit, they did so with the understanding that the extant protocol, SOP 135, would not be used for their executions. Because Idaho had not issued a revised SOP at that time, plaintiffs raised several claims alleging that the *lack* of any execution protocol violated their rights. Idaho has now issued a revised SOP, so we find these claims moot. The injunctive relief that plaintiffs seek—enjoinment of executions until IDOC issues a revised protocol—is no longer necessary. In addition, we have no basis to think that IDOC would create a situation where there is no execution protocol in place for these plaintiffs. *See Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1152 (9th Cir. 2019) ("Where the challenged conduct has been sufficiently altered so as to present a substantially different controversy . . ., there is no basis for concluding that the challenged conduct [will be] repeated." (cleaned up)). Thus, the court's resolution of plaintiffs' claims alleging that the lack of a protocol violates certain rights would serve no legally cognizable purpose. *See Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964 (9th Cir. 2007).

## IV.

We now apply these principles of ripeness and mootness to each of plaintiffs' specific claims. Because "ripeness is peculiarly a question of timing, it is the

situation now rather than the situation at the time of the [d]istrict [c]ourt's decision that must govern." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974).

Claim One alleges that plaintiffs have an "enforceable right of access to certain government proceedings and records that is secured by the First and Fourteenth Amendments," and that IDOC has violated that right by failing to provide them with execution-related information.[12] This claim is ripe.[13] Plaintiffs argue that they have a First Amendment right to execution-related information, which IDOC is currently violating. Whether or not plaintiffs possess such a right is a legal question, and whether such a right (if it exists) has been violated depends on the content of the revised SOP, which is now available. In Claim One, plaintiffs also allege that the right of access to governmental proceedings includes their lawyers' "right to access the execution chamber, the right to witness the entire execution procedure, and the right to be permitted access to cameras and phones during the execution." Although

---

[12] This is the same set of information plaintiffs initially sought in their December 2018 letter to the Director. Specifically, the information concerns:

> (1) the number, amount, and type of drugs to be used, (2) how the drugs were made, how the drugs were/will be obtained, their source, amounts, expiration date, how they were acquired/transported/stored/tested, when IDOC [will obtain] the drugs, etc., (3) when a new version of SOP 135 will be issued, (4) whether witnesses will be able to observe the insertion of the IVs, (5) procedures for IV placement/length, (6) who will participate in the execution, what is their training/qualifications, and how will they be chosen, (7) whether there will be a consciousness check and the procedure for it, and (8) procedures for botched executions.

[13] Of course, to the limited extent this claim seeks information about "when a new version of SOP 135 will be issued," we find that clearly moot.

18

this part of Claim One is more in the nature of a pre-enforcement challenge, we presume the revised SOP will govern plaintiffs' executions, so they will suffer certain injury if their allegations are true. And because judicial resolution of these allegations is possible now in light of the revised SOP, we find this claim ripe.

Claim Two seeks much the same information as Claim One, except under the theory that the deprivation of such information "denies the plaintiffs' First Amendment right to petition the government for redress of grievances." Therefore, this claim is ripe for the same reason Claim One is ripe: plaintiffs allege a current constitutional violation caused by the SOP's lack of information, which is fit for judicial resolution.

Claim Three alleges that the "absence of a real execution protocol constitutes cruel and unusual punishment in violation of the Eighth Amendment." Plaintiffs base this claim on the fact that "there is no IDOC protocol in place mandating procedures that the defendants must follow when carrying out an execution." Because that factual allegation is no longer true, and there is now a revised SOP, this claim is moot.[14]

---

[14] It may be possible to interpret Claim Three as alleging that the SOP's failure to provide the information that plaintiffs seek (as opposed to the lack of an execution protocol at all) is itself cruel and unusual punishment. That claim would be ripe for the same reasons that Claim One and Claim Two are ripe.

19

Claim Four alleges that Idaho's "deprivation of information violates the plaintiffs' Fourteenth Amendment right to due process." Plaintiffs contend that the state has denied them procedural due process by failing to provide them "fair notice of the procedures to be used" in their execution and that "the lack of information raises a procedural barrier to challenging the constitutionality of IDOC's execution process." For the most part, this claim bases its due process violation on the absence of "fair notice," which we interpret to mean the lack of an execution protocol. Therefore, we find this claim mostly moot because plaintiffs are now on notice of the revised SOP and can challenge its legality. However, to the extent Claim Four asserts a due process violation premised on the SOP's failure to provide execution-related information, we find that claim is ripe (and not moot). That is because the plaintiffs allege the lack of information is itself the denial of due process. If the allegations are founded, then withholding decision of this issue would continue to deny plaintiffs due process.

Claim Five alleges two different equal protection violations. First, plaintiffs claim that the "absence of a real execution protocol" violates the Equal Protection Clause, because of "the variances [in] execution procedures that invariably exist if no protocols are currently in place whatsoever." The revised SOP makes this portion of Claim Five moot. Second, plaintiffs suggest that Idaho's "practice of essentially creating a new protocol for each condemned inmate as soon as his execution is

imminent" is itself an equal protection violation. If so, this allegation is ripe because whether Idaho's practice of promulgating protocols violates the Equal Protection Clause is already concrete and fit for resolution.

Claim Six alleges that the "deprivation of information violates the plaintiffs' federal statutory right to the assistance of counsel." The relevant statute is 18 U.S.C. § 3599, which entitles indigent death-row inmates to representation in post-judgment proceedings and clemency petitions. *See* 18 U.S.C. § 3599(a). Plaintiffs claim they would seek clemency if the execution protocol could cause an unduly painful death, but they cannot do that if the state "tell[s] them essentially nothing about those [execution] plans." Thus, we understand Claim Six to allege that the lack of an execution protocol deprives plaintiffs of their statutory rights, in which case the claim is moot.

Claim Seven alleges that the "absence of legislative guidelines for executions violates the separation of powers under the Idaho Constitution." That is, plaintiffs contend that the Director's statutory authorization to determine the procedures of executions is an unconstitutional delegation of legislative power. Taking those allegations as true, plaintiffs will certainly suffer injury if they are executed under an unlawful delegation of power. Whether or not that delegation is lawful is a question the court is well positioned to answer now. Claim Seven is ripe.

21

Claim Eight alleges that "IDOC's refusal to promulgate a protocol violates its statutory obligations" under Idaho Code § 19-2716. With the promulgation of the revised SOP, this claim is moot.

Claim Nine alleges that the "deprivation of information creates a substantial risk of serious harm in violation of the Eighth Amendment." This claim is difficult to comprehend in its current form. We construe it to mean that the absence of a protocol violates the Eighth Amendment, and with that understanding, we find this claim moot.

In summary, we find Claim One, Claim Two, part of Claim Four, part of Claim Five, and Claim Seven ripe. We find the rest moot. In addition, we note that plaintiffs' state law claims suffer from an additional problem. "Unless there is a breach of constitutional rights, . . . § 1983 does not provide redress in federal court for violations of state law." *Samson v. City of Bainbridge Island*, 683 F.3d 1051, 1060 (9th Cir. 2012) (alteration in original) (citation omitted). Plaintiffs allege their state law claims independent of any federal constitutional violations, so § 1983 is not the appropriate vehicle to bring those claims. Instead, the plaintiffs asked the district court to exercise supplemental jurisdiction over these state law claims. However, they failed to so plead in their complaint. Thus, we presently lack jurisdiction over plaintiffs' state law claims for this additional reason, although they

22

may rectify this mistake by amendment.  *See Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 232–33 (5th Cir. 2016).

V.

There is no doubt that the merits of plaintiffs' claims are important and deserve speedy resolution.  However, IDOC's decision to issue a revised SOP (on the eve of argument) affects not only the ripeness of plaintiffs' claims, but potentially the substance of their claims as well.  Thus, we reverse and remand this case to the district court.  On remand, plaintiffs will likely seek (and should be permitted) to amend their complaint to reallege their ripe claims against the revised SOP and fix the flaws in their state law claims.

Plaintiffs, however, may be unable to amend their complaint in a way that advances any colorable claims.[15]  Plaintiffs' First Amendment claims appear squarely foreclosed by our caselaw.  In *First Amendment Coalition of Arizona, Inc.*

---

[15] We feel it appropriate to discuss the merits now, in advance of plaintiffs' decision to amend their complaint on remand.  As plaintiffs have repeatedly argued to both the district court and on appeal, time is particularly of the essence here.  This urgency has only increased with Idaho's decision to issue, during the pendency of this appeal, first a revised protocol and now a death warrant for Pizzuto.  Further, the merits of plaintiffs' claims were briefed before the district court, and the merits involve predominantly legal questions that do not require any factfinding.  Courts regularly discuss the merits of claims in considering the futility of amendment, *see Hooper v. Shinn*, 985 F.3d 594, 622 (9th Cir. 2021), or as part of an alternative holding, *see Whitaker*, 862 F.3d at 496 & n.14.  Here, our discussion of the merits of plaintiffs' ripe claims may inform how they choose to amend their complaint, and our discussion of the moot claims provides alternative reasons why they fail.

*v. Ryan*, 938 F.3d 1069, we held that neither the First Amendment right of access to governmental proceedings nor the right of access to courts "entitle[s] the plaintiffs to information regarding execution drugs and personnel." *Id.* at 1080–81.[16] At argument, plaintiffs' counsel suggested that *First Amendment Coalition* is distinguishable because Pizzuto and Creech do not even know what drug will be used in their execution. But that distinction seems unlikely to matter given our reasoning in *First Amendment Coalition* that "the First Amendment does not mandate a right of access to government information or sources of information within the government's control." *Id.* at 1079 (cleaned up). Further, we note that Idaho's revised SOP permits only four methods of execution, with significant overlap in the drugs used for each method. So although plaintiffs might not know yet which of the four methods the state may choose, they know the state is restricted to a closed and limited universe of drugs, and they know what those drugs are.

Plaintiffs additionally seek to extend the right of access to governmental proceedings that we discussed in *First Amendment Coalition* to include their counsel's right to access cameras and phones during the execution. *See id.* at 1075. We find it implausible that the First Amendment right of access to governmental

---

[16] Plaintiffs' second claim is framed as a right to petition the government for redress of grievances, but it primarily asserts a right of access to the courts. *See Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) ("The right of access to the courts is subsumed under the first amendment right to petition the government for redress of grievances.").

proceedings gives the public the right to videotape, photograph, or otherwise record those proceedings. *See Rice v. Kempker*, 374 F.3d 675, 678–79 (8th Cir. 2004); *Wis. Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614, 627 (7th Cir. 2011). We are also uncertain why the right of access to governmental proceedings entitles plaintiffs' counsel to have access to phones in the witness area. If plaintiffs wish their counsel to have phones so that they can contact the court during executions, that claim would be properly alleged under the First Amendment right of access to courts. *But see Arthur v. Comm'r, Ala. Dep't of Corr.*, 857 F.3d 1157, 1160 (11th Cir. 2017) (Hull, J., concurring in denial of rehearing en banc) ("[T]his [c]ourt's panel opinion emphasized that [plaintiff] failed to cite any authority standing for the proposition that visitors . . . have any independent constitutional right to telephone access inside the execution viewing room.").

It is true that in *First Amendment Coalition* we left open the possibility that plaintiffs "may be able to assert a procedural due process right to obtain the information they seek." 938 F.3d at 1080. *But see Jones v. Comm'r, Ga. Dep't of Corr.*, 812 F.3d 923, 925–26 (11th Cir. 2016) (Marcus, J., concurring in the denial of initial hearing en banc) (finding inmates have no protected liberty interest in disclosure of information about executions); *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016) (holding that "no constitutional right exists to discover grievances"); *Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir. 2015) (en banc) (per curiam);

25

*Sepulvado v. Jindal*, 729 F.3d 413, 418–20 (5th Cir. 2013). Even if such a due process right exists, we find it hard to imagine that it applies in this situation. Our due process suggestion was prompted by a particular concern with "Arizona's checkered past with executions," *First Amend. Coal.*, 938 F.3d at 1080, which included last-minute changes to the protocol, an extraordinary degree of secrecy during and after the execution, and a record of troubling executions, *see Lopez v. Brewer*, 680 F.3d 1068, 1083 (9th Cir. 2012) (Berzon, J., concurring in part and dissenting in part). None of those circumstances exist here. Idaho has issued an execution protocol well in advance of any death warrant in this case, and there is no indication the state will deviate from the procedures outlined in the revised SOP. Those procedures provide for a relatively transparent execution by, for example, ensuring that witness areas have full access to the audio of the execution and requiring the prison warden to "document every aspect of the execution proceeding." And although plaintiffs describe the unusual process by which they claim Idaho has previously obtained execution drugs, they have not alleged any facts that suggest Idaho's past executions caused unduly painful deaths.[17]

---

[17] Of course, Idaho will continue to be bound by not only "its constitutional obligation to ensure that the implementation of its new protocol does not run afoul of the Eighth Amendment's proscription of cruel and unusual punishment, but also . . . its moral obligation to carry out executions with the degree of seriousness and respect that the state-administered termination of human life demands." *Jackson v. Danberg*, 594 F.3d 210, 230 (3d Cir. 2010).

Nor do any of plaintiffs' other ripe theories appear viable. To the extent plaintiffs claim that Idaho's execution protocol allows so much variance in execution procedures that it violates the Equal Protection Clause, we have already rejected such a theory. In *Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012) (per curiam), we held that "[a]bsent any pattern of generally exercising the discretion in a particular manner while treating one individual differently *and* detrimentally, there is no basis for Equal Protection scrutiny under the class-of-one theory." *Id.* at 660–61 (emphasis in original). Plaintiffs allege only that they are being treated differently, not that they are "being treated less favorably than others generally are." *Id.* at 661; *see also Lopez*, 680 F.3d at 1076. In addition, plaintiffs' claim under the Idaho Constitution has been soundly rejected by the Idaho Supreme Court, which held that the Director's authorization to promulgate execution procedures is not an improper delegation of legislative power. *State v. Osborn*, 631 P.2d 187, 201 (Idaho 1981).[18]

Finally, although we dismiss several of plaintiffs' claims as moot, we note that those claims also rested on implausible theories. We have never suggested the

---

[18] In *Osborn*, the Idaho Supreme Court considered the 1978 version of Idaho Code § 19-2716. That version was identical in all relevant respects to the present statute—it prescribed lethal injection and gave the Director the authority to "determine the substance or substances to be used and the procedures to be used in any execution." 1978 Idaho Sess. Laws 140. In 1982, the Idaho legislature amended § 19-2716 to permit the Director to conduct executions by firing squad, but that amendment was repealed in 2009, leaving lethal injection as the sole method of execution. *See* 2009 Idaho Sess. Laws 228.

Eighth Amendment imposes an affirmative obligation on the state to issue execution protocols. *Cf. Payton*, 658 F.3d at 893 (dismissing Eighth Amendment claim in the absence of any protocol as unripe). After all, it is hard to imagine how the *lack* of a protocol is cruel and unusual punishment. *Cf. Smith v. Mahoney*, 611 F.3d 978, 998 (9th Cir. 2010) (rejecting a *Lackey* claim alleging that prolonged time on death row constitutes cruel and unusual punishment). Nor have we located such an obligation in the Equal Protection Clause. Plaintiffs suggest such a right might be found in 18 U.S.C. § 3599, but that statute does not "empower the court to order third-party compliance" to aid plaintiff's counsel in seeking clemency. *Leavitt v. Arave*, 682 F.3d 1138, 1141 (9th Cir. 2012) (per curiam). And although Idaho Code § 19-2716 provides that the Director "shall determine the procedures to be used in any execution," we do not read that provision as requiring the Director to always maintain an extant execution protocol.

That said, we emphasize that our view of the merits of plaintiffs' theories has no bearing on the ripeness of their claims. Ripeness is simply a question of "when." For the mooted claims, it is too late, but for the remaining claims, the time for judicial resolution is now.

**REVERSED and REMANDED.**

*Gerald Ross Pizzuto, Jr. and Thomas E. Creech v. Josh Tewalt, Director, Idaho Department of Correction, and Brad Little, Idaho State Governor*, 20-36044

GOULD, Circuit Judge, concurring in part, and dissenting in part:

I concur in Judge Bennett's majority opinion insofar as it holds that Claim Three, part of Claim Four, part of Claim Five, Claim Six, Claim Eight, Claim Nine, and the state law claims of Appellants' complaint are moot.[1]  I also concur in the judgment with respect to Pizzuto's appeal because a death warrant has issued. I respectfully dissent, however, with respect to Creech's appeal, and would affirm the district court's dismissal of his claims for lack of ripeness.  As the district court explained, appellants Pizzuto and Creech "do not dispute the constitutionality of lethal injection execution or the legitimacy of their sentences."  Both of them are, of course, entitled to fair procedure in accord with law, and if they want to challenge the method of execution, they should have a reasonable time to make their challenge after the State of Idaho has decided to proceed with execution.  But in my view, we lack Article III jurisdiction to decide Creech's appeal so long as it is uncertain whether an execution will proceed and generally how it is to proceed.

The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Reno v.*

---

[1] I also agree with the Majority that we lack jurisdiction over Plaintiffs' state law claims for the additional reason that Plaintiffs failed to plead a basis for jurisdiction in their complaint.

*Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993).  It is designed "to separate matters that are premature for review because the injury is speculative and may never occur from those cases that are appropriate for federal court action." *Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993) (internal quotation marks omitted).  "[T]hrough avoidance of premature adjudication," the doctrine prevents courts "from entangling themselves in abstract disagreements." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977).

I agree with the district court reasoning as to the lack of ripeness when the district court made its decision, for the following reasons: First, standing is a "threshold question" and is "a necessary element of federal-court jurisdiction." *City of South Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 233 (9th Cir. 1980).  Second, "[c]onstitutional ripeness is often treated under the rubric of standing because ripeness coincides squarely with standing's injury in fact prong." *Safer Chemicals, Healthy Families v. EPA*, 943 F.3d 397, 411 (9th Cir. 2019) (citation omitted).  Third, because Creech seeks information regarding an execution that is entirely presupposed, deciding his claims at this stage would be premature.  I further agree with the district court that when the State of Idaho moved to dismiss Appellees' complaint, "[t]he ultimate question of whether the two men will even be executed remain[ed] an undetermined and open question."

Since then, of course, Pizutto's death warrant has issued, and the majority correctly allows his claims to proceed. But nothing has changed with respect to Creech's appeal. He may, for instance, obtain appellate relief in his other pending cases. Idaho's governor may decide to grant clemency; its legislature could intervene to avoid a death warrant. Creech's execution is far from a foregone conclusion. His claims are still not yet ripe.

Our court would do well to follow the rule stated by the Supreme Court in *Texas v. United States*: "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." 523 U.S. 296, 300 (1998) (cleaned up). The lack of ripeness practically means that Creech's claims were brought too soon for us to decide them and that they were properly dismissed without prejudice—although they could be advanced later when the case is ripe.

As for when the claims for information will become ripe, I do not agree with all of the district court's rationale insofar as the district court thought the case could not be ripe until all appeals had been fully resolved. The reason that I cannot agree with this is that in a system of federalism where the State of Idaho controls its procedures, nothing would guarantee that the State would not commence planning an implementation of the death penalty execution while some appellate issue remained pending. So that rationale in my view went too far.

3

But on the other hand, it cannot be fairly said that execution is certain to proceed before the State of Idaho issues a death warrant. That is the key point before which execution cannot proceed, though after it issues, many tasks are to be accomplished by certain times. Among these is a specific requirement that between thirty and twenty-one days before the execution, the State of Idaho's Administrative Team must "[e]nsure that execution chemicals have been purchased or that sources have been established." Under this procedure, there will always be at least three weeks before execution when the State of Idaho could give notice to the prisoner and the prisoner's counsel of record about the chemicals purchased or planned for in the execution. To be sure, twenty-one days is not a long time for counsel to evaluate their potential claims and to get the matter of any federal constitutional claim before a federal court. But given the ability of courts to issue restraining orders *ex parte* or grant preliminary injunctions after giving notice to the state and an opportunity to be heard, and given the ability of courts to decide matters upon expedited or emergency motions, it seems to me that there is no reason any challenge to the specific execution plans could not be fairly asserted within twenty-one days after chemicals were ordered or planned for use with sources established. That is a tight deadline for legal action, but in my view, both Article III and the Supreme Court's precedent demand it. A federal court request for information about execution procedures cannot properly proceed before Idaho

has made its ultimate decision by issuing a death warrant and serving it upon the Idaho Department of Correction.[2]

Even if the rationale chosen by the district court was not entirely correct in all of its details, I believe the district court was correct that the case was unripe because of contingencies that could occur avoiding the presupposed execution. As the district court correctly observed, it is not our proper province to predict how other courts will decide issues pending before them, much less do we have any basis to predict how the Governor or legislature of the State of Idaho may decide any issue placed before them. A court could grant relief, a legislature could alter its law, or the Governor could decide to exercise his discretionary power of clemency. In my view, it does not make sense in capital cases to proceed to examine method of execution before there has been a death warrant, which crystalizes the immediacy of planned and lawful execution.

By interceding at this point, the majority risks the possibility that its rationale would only lead the State into a more entrenched position that would, as a practical matter, make legislative action or clemency from the Governor less likely.

---

[2] If the State of Idaho wants to avoid the risk of last minute potential stays of execution and necessary changes of plans, with all the stress that creates for all persons concerned, the condemned prisoners along with their families and the Governor of Idaho and the Director of the Idaho Department of Correction, along with their staff, then it would be prudent for the Idaho Department of Correction to provide notice at the earliest feasible opportunity of the planned chemical usage for execution.

Given the experience in several other states where Governors put death penalties on hold pending more study or proceedings, I don't share the majority's seeming certainty that the death penalty will proceed.

Under our precedent, we may affirm on any ground supported by the record. *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1096 (9th Cir. 2004). I would exercise our discretion to affirm in part the dismissal of Creech's claims based on the record showing there has been no death warrant issued, while at the same time through our supervisory power suggest that the State give notice of its planned procedure at the earliest practical time not later than twenty-one days before the date of the scheduled execution.

That is not a perfect solution, but there will never be a perfect solution in a case where the ultimate penalty of death is to be administered and prisoners or their family or friends still have any question about guilt, propriety of sentence, or method of execution. To me the most sensible approach here is to preclude suit until a death warrant issues, if that occurs, and then to use expedited judicial procedures to gain a final ruling ahead of the planned execution date and time. For that reason, I agree with the majority's conclusion that Claim One, Claim Two, part of Claim Four, part of Claim Five, and Claim Seven are ripe with respect to Pizzuto, for whom the State of Idaho has issued a death warrant. But because the State has not yet issued a death warrant for Creech, I cannot join my colleagues in

6

concluding that any of his claims are ripe.

Also, it should not be considered that proceeding with a lawsuit seeking information about execution procedure before a death warrant issues has no cost to parties or the State. The State of Idaho will have to marshal its legal resources at significant cost to respond to any complaint filed at this stage before a death warrant issues. There is also a cost to the federal court system, at expense of federal taxpayers, when the federal court system needs to address lawsuits requesting information about death penalty procedures before a death warrant issues.

It is perhaps correct that the legal standard for ripeness does not require absolute certainty, but only a reasonable probability that the execution will occur. But still, to proceed before a death warrant is to put the cart before the horse, and it may be an impediment to actions by the legislature or the Governor that could avoid death. As I have said, awaiting a death warrant is not a perfect solution, but in my view, it is a superior procedure to proceeding at this stage with litigation about a presupposed execution, and I am not aware of any Supreme Court precedent that would preclude our court upon an *en banc* rehearing from adopting the view of ripeness that I have suggested.